## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

> Plaintiff,

vs.                                                      No.  CR-05-99 MV

GONZALO MUÑOZ-NAVA,

> Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress **[Doc. No. 18]**, filed March 31, 2005. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

## BACKGROUND

On December 20, 2004, DEA Special Agent Jarrell Perry was at the Americano's Bus Station in Albuquerque, New Mexico waiting to meet the bus arriving from El Paso, Texas.  Based on his training and experience, Agent Perry testified that El Paso is a source city for various types of illegal narcotics.  At 1:45 p.m., the bus arrived. Agent Perry observed Defendant exit the bus, enter the bus station and then exit the bus station and walk into the parking lot area.  Defendant was carrying a blue Wal-Mart plastic shopping bag.

Agent Perry approached Defendant, displayed his DEA badge and credentials to Defendant, and asked Defendant if he spoke English.  When Defendant replied that he did, Agent Perry identified himself as a police officer and asked Defendant for permission to speak with him, which Defendant granted.  Agent Perry testified that he did not inform Defendant that he had the right to refuse to speak to him at this point or at any other point during the encounter.

Agent Perry asked Defendant where he was going and Defendant replied that he was traveling from El Paso to Albuquerque.  Agent Perry then asked Defendant where he lived and Defendant replied that he lived in El Paso.  Defendant also informed Agent Perry that he was visiting his parents in Albuquerque for approximately one week.  Agent Perry asked Defendant if he had any luggage and Defendant said yes, pointing to the shopping bag.

Agent Perry then asked Defendant for his consent to a search of the shopping bag for illegal contraband.  Defendant gave his consent.  The search revealed a pair of tan cowboy boots, a pair of tan shoes that Agent Perry described as house shoes or slippers, a black sweatshirt and a U.S. Certificate of Naturalization.  No illegal contraband was found.  Agent Perry testified that, based on his experience working on drug interdiction on trains and buses, he found it unusual for an individual to be visiting his family for the holidays without any toiletry items and with so little clothing.  Agent Perry further testified that, in previous seizures he made of individuals with narcotics concealed in their footwear, the individuals were traveling with virtually no luggage other than a change of shoes.

At that point, Agent Perry asked Defendant for his consent to a search of his person for illegal contraband.  Defendant gave his consent.  No illegal contraband was found.  Agent Perry did not inform Defendant that he was not obligated to consent to the search of his person.

Next, Agent Perry asked Defendant for his consent to a search of the black cowboy boots that Defendant was wearing.  At the hearing, Agent Perry testified that he made this request based on his observation that the boots looked "ballooned up" as if the boots were too small or there was something underneath pushing up the top of the boots.  Agent Perry described the boots as "marshmallow[s] that w[ere] ready to burst." Agent Perry also testified as to his observation that the boots had "alligator-type, thin-skinned scales."  According to Agent Perry, he previously made a

-2-

seizure of approximately twenty pairs of boots that had been abandoned in a yard in Los Lunas with

the same alligator-type, thin-skinned scales.  Agent Perry further testified that those abandoned boots

had the heel or sole removed, revealing false compartments.  Agent Perry also explained that, prior

to the instant case, in the course of his seven years with DEA, he made eight seizures of individuals

who were traveling by bus from El Paso to Albuquerque with heroin concealed in their boots, shoes

or sneakers.

Defendant removed his left boot and handed it to Agent Perry.  Agent Perry observed that

the boot had a design similar to that of the boots he had found in the yard in Los Lunas.  Agent Perry

further observed that the bottom of the boot had what he described as a "distinct bulge"and a black

dressing, which usually is used only on the heel and sole of a boot, covering its entirety.  The tag on

the inside of the boots showed that the boots were size ten "Star" brand boots.  Agent Perry testified

that the boots he had found in the yard in Los Lunas also were black, size ten "Star" brand boots.

Agent Perry also observed that the boot seemed overly heavy, especially in comparison to the tan

boots in Defendant's bag.  According to Agent Perry, he observed glue in the inner sole area of the

boot and, for this reason, smelled the inside of the boot, which had an odor of fresh glue.  Agent

Perry testified that, in the previous seizures he had made involving heroin concealed in footwear, the

footwear felt overly heavy and smelled of fresh glue.

Agent Perry then asked Defendant if he could search the other boot that he was wearing.

Defendant removed his right boot and handed it to Agent Perry.  Agent Perry observed that the right

boot, too, was overly heavy, had a distinct bulge on the bottom, had glue inside of the inner sole area

and had dressing covering the entire bottom.  At that point, Agent Perry asked Defendant if the boots

belonged to him and Defendant replied that they did.  Defendant further stated that he purchased the

boots one month earlier in Juarez for $100.  Agent Perry testified that the fresh smell of glue, the fresh look of the black dressing covering the bottom and the absence of signs of wear on the bottom were not consistent with Defendant's statement that the boots were one month old.

Agent Perry then asked Defendant for his consent to cut into one of the boots.  According to the government, Defendant first said yes but then withdrew his consent.  According to Defendant, he said no.  Agent Perry next asked Defendant if he would consent to a dog sniff of his boots.  Defendant gave his consent.  Agent Perry requested assistance from Task Force Officer Greg Rees, a certified narcotics canine handler with the Bernalillo County Sheriff's Department who was assigned to the DEA Office.     TFO Rees testified that he and his dog, Taz, are certified by the Sheriff's Department, the California Narcotics Canine Association and the North American Police Work Dog Association.  TFO Rees explained that each of these organizations requires annual certifications.  Taz is trained and certified to detect the odors of marijuana, heroin, cocaine and methamphetamine.  TFO Rees testified that, prior to the instant case, Taz had never done a sniff of boots and that, after the instant case, he and Taz attended a training session on sniffing boots.

While they were waiting for TFO Rees, Agent Perry asked Defendant why his boots were so heavy.  Defendant responded that he intentionally purchased heavy boots so that he would get exercise when he walked.  Also while they were waiting, Defendant informed Agent Perry that his father had arrived to pick him up. Defendant's father came over to them and stood with them on the sidewalk.

TFO Rees testified that, upon his arrival at the scene, Agent Perry asked him to have his dog conduct a sniff of a pair of black boots that he suspected contained narcotics.  Agent Perry testified that he asked Defendant for his consent to move the boots to another location to facilitate the dog

sniff.  Defendant gave his consent.  Agent Perry asked Defendant if he would like to come observe

the sniff and he replied that he would.  TFO Rees testified that he placed both the black boots and the

tan boots on the concrete sidewalk against the exterior wall of a building in the parking lot of the bus

station, alternating one black boot, one tan boot, one black boot and one tan boot.  TFO Rees

testified that he included the tan boots, which Agent Perry did not suspect contained narcotics, in

order to create a "subjective search area" for the dog.  According to TFO Rees, it was a windy day

and, as he faced the wall, the wind was blowing from behind him toward the wall.

TFO Rees then deployed Taz on the boots, starting with the black boot on the far left.  TFO

Rees testified that he observed an "odor change" in Taz when he sniffed the first black boot.  TFO

Rees explained that, during a sniff, when Taz begins to smell the odor of narcotics, he exhibits certain

characteristics that mark an "odor change":  he turns his head back, he backtracks and he starts

breathing more deeply.  According to TFO Rees, the "odor change" occurs when Taz has smelled

the odor of narcotics and is in the process of trying to find the source of that odor.  TFO Rees

explained that this odor change occurs prior to an actual indication or alert, which occurs when Taz

has found the source of the odor.  TFO Rees described Taz's indication or alert as an "aggressive

alert," meaning that he indicates or alerts by biting or pawing and scratching the source of the odor.

Agent Perry testified that, after Taz sniffed the boots, TFO Rees informed him that Taz had not

alerted or indicated to the boots for an odor of illegal narcotics but that Taz "did show an odor

change," which TFO Rees explained to mean that Taz smelled an odor of narcotics but could not

pinpoint the exact location of the illegal narcotics.

TFO Rees testified that he was concerned that the windy conditions and the fact that the boots

were placed close together were making it difficult for Taz to identify the source of the odor of

narcotics.  Specifically, TFO Rees explained that, if both black boots contained narcotics, because they were located in a limited area and the wind was blowing toward the wall, it would be impossible to tell whether the odor the dog was smelling was coming from the black boot he was sniffing or from the other black boot located further along the wall.  For this reason, TFO Rees testified, he advised Agent Perry that he wanted to attempt another dog sniff in an indoor location.  TFO Rees testified that he asked the owner of a garage adjacent to the bus station if they could conduct a dog sniff there.  According to TFO Rees, the owner consented.

TFO Rees testified that the garage was cluttered with tools and bicycles and that the only open space in which to conduct the sniff was a pedestrian walkway leading from the open garage bay to the adjacent business.  In addition, TFO Rees noted that there was an industrial heater above the garage door that was blowing onto the walkway, creating what he described as a "wind tunnel." Nonetheless, TFO Rees testified, he again placed the boots in a line, alternating colors.  TFO Rees deployed Taz and informed Agent Perry that Taz again showed an odor change but did not indicate or alert to the source of the odor.  TFO Rees testified that Taz's difficulty in locating the source of the odor could have been the result of the wind blowing the odor from one part of the search area to another.

At that point, Agent Perry asked Defendant if the black boots contained drugs and Defendant responded that he did not think so.  Agent Perry then placed the tan boots back in Defendant's shopping bag but maintained custody of the black boots.  Agent Perry advised Defendant that the black boots were being detained while he sought a warrant to search the soles of the boots for illegal narcotics.  In addition, Agent Perry informed Defendant that he was being detained pending the execution of the search warrant.  Agent Perry told Defendant that, while he was not under arrest, he

was not free to leave and would be taken to the DEA Albuquerque District Office.  Either Agent Perry or TFO Rees handcuffed Defendant and placed him in TFO Rees's vehicle.  TFO Rees transported Defendant to the DEA Office.  At the DEA Office, Defendant was placed in a temporary holding cell.

TFO Rees testified that, once they arrived at the DEA Office, he conducted another sniff of the boots in the underground parking garage.  TFO Rees testified that the garage doors were closed and that he again alternated the black and tan boots.  TFO Rees explained that he spaced the boots approximately ten feet apart so that if the garage doors were to open, the wind would not blow the odor of narcotics from one part of the search area to another.  TFO Rees testified that he deployed Taz on the boots and that, when they came to the first black boot, Taz did "a full bite alert."  Agent Perry testified that TFO Rees informed him that Taz alerted to one of the black boots for the odor of illegal narcotics.  Agent Perry further testified that he observed Taz pick up the boot, bite it and shake it.

After the alert, Agent Perry obtained a federal search warrant to search the boots.  Upon execution of the warrant, Agent Perry and TFO Rees cut into Defendant's black boots with a knife and found in each boot identical, clear, plastic-wrapped bundles of a brown, rock-like substance.  Each bundle weighed .40 kilograms and field-tested positive for the presence of heroin.

Agent Perry testified that, at approximately 7:10 p.m., he read Defendant his *Miranda* rights from a DEA 13-A card and that TFO Rees witnessed this.  After reading each right, Agent Perry testified, he asked Defendant if he understood and Defendant replied yes.  Thereafter, Agent Perry testified, Defendant agreed to answer questions and admitted that a man from Durango, Mexico recruited him to transport the boots, that he knew the boots contained some type of illegal drugs, that

he was to receive $1,000 for transporting the boots and that he was to be contacted at his parents' house to arrange an exchange of the boots and the money.  Agent Perry testified that Defendant stated that he agreed to transport the heroin in order to have money to buy Christmas presents. Later, Agent Perry testified, Defendant advised the agents that this was his second trip transporting boots that contained drugs.  The agents' interview of Defendant took place approximately five hours after he was originally approached by Agent Perry at the bus station.

On March 31, 2005, Defendant filed the instant motion to suppress all statements and evidence obtained as a result of the detention of his person and his boots.  The government filed a response in opposition on April 18, 2005.  On June 23, 2005, the Court held an evidentiary hearing on the motion.  At the conclusion of the hearing, the Court took the matter under advisement.

## DISCUSSION

There are "three categories of police-citizen encounters:  '(1) consensual encounters which do not implicate the Fourth Amendment . . . (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.'"  *United States v. Shareef*, 100 F.3d 1491, 1499 (10th Cir. 1996) (citing *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996)).

### A.    Questioning and Search of Defendant at the Bus Station

A consensual encounter "occurs when there is voluntary cooperation by [a] private citizen in response to non-coercive questioning by [a] police officer."  *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991).  "In determining whether a police-citizen encounter is consensual, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police

conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).  Each case "turns on the totality of the circumstances presented."  *Id.* (citations omitted).

If a defendant consents to a search during a consensual encounter, whether this consent is valid is a question of fact to be determined from the totality of the circumstances.  *See United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000).  The government bears the burden of proving valid consent.  *See United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir.), *cert. denied*, 525 U.S. 903 (1998).  To establish that the defendant's consent was valid, the government "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given'" and "must show that the police did not coerce the defendant into granting his consent."  *Id.* (citation omitted); *see also United States v. Flores*, 48 F.3d 467, 468 (10th Cir.) (government must prove that defendant's consent was voluntary and was not given under duress or coercion), *cert. denied*, 516 U.S. 839 (1995).  With regard to whether consent is voluntarily given, "the dispositive issue is whether a reasonable law enforcement officer would have understood defendant's actions to indicate her voluntary consent to the search."  *Flores*, 48 F.3d at 469.  With regard to whether consent is free from coercion, the court is directed to consider: "'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.'"  *Pena*, 143 F.3d at 1367 (citation omitted).  An officer's failure to inform the defendant that he can refuse or withdraw consent or that he can leave the scene is also relevant.  *See id.*  Finally, "[a]n officer's request for

consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'"  *Id.* (citation omitted).

Defendant argues that, although the initial contact between Defendant and Agent Perry was consensual, the consensual encounter escalated into a seizure.  According to Defendant, although he may have agreed to answer a quick question, he did not agree to the continued encounter.  Taking into account all of the circumstances, the Court finds that the encounter between Defendant and Agent Perry remained consensual until the point at which Agent Perry informed Defendant that he and his boots were being detained.  Defendant has not identified any factors that would suggest that a reasonable person in his position would have felt that he was not free to leave or to refuse to answer Agent Perry's continued questions.  Specifically, Defendant notes that Agent Perry subjected him to public humiliation by questioning him, searching his person and having him stand for at least a portion of the encounter in his socks and then his slippers on a busy downtown sidewalk in front of a crowd of at least fifty people and his own father.  These factors suggest that the encounter may have been unpleasant or uncomfortable but are not determinative of the issue of whether Defendant felt free to refuse to remain in public view, answering Agent Perry's questions and complying with his requests.  Similarly, Defendant notes that, although Defendant did not appear suspicious and did not provide any suspicious answers to Agent Perry's initial questions, Agent Perry nonetheless subjected him to increasingly intrusive requests.  It is clear, however, that suspicion was not required for Agent Perry's continued questioning so long as he did not convey to Defendant that he was not free to leave.  Given the otherwise consensual nature of the encounter, the absence of suspicious behavior or statements by Defendant does not make the encounter improper.  Finally, Defendant has pointed to no evidence that Agent Perry constrained Defendant with an overbearing show of authority, threatened Defendant

in any way, drew his weapon or spoke to Defendant in a disrespectful or unprofessional manner. Accordingly, a reasonable person under the circumstances would have believed that he was free to leave or disregard Agent Perry's questions and requests.

Moreover, the totality of the circumstances shows that Defendant's consent to the search of his person and his boots and to the dog sniff of his boots was unequivocal, specific and freely and intelligently given.  The evidence demonstrates that Agent Perry sought Defendant's consent first to speak with him, then to search his shopping bag, then to search his person, then to search his boots, then to have a dog sniff of his boots and finally to cut into his boots.  The evidence further demonstrates that Defendant agreed to each of those requests other than the request to cut into his boots.  There is no evidence that Defendant hesitated in granting his consent to Agent Perry's requests until the request for consent to cut into his boots. Similarly, there is no evidence that, in requesting consent for the searches and the dog sniff, Agent Perry coerced, threatened or promised anything in return for Defendant's consent.  The Court thus is convinced that a reasonable law enforcement officer would have understood Defendant's actions to indicate his voluntary consent to the search of his person, his shopping bag and his boots and to the dog sniff.

The Court thus finds that the entire encounter at the bus station was consensual and that, during the course of this consensual encounter, Defendant provided valid consent to the search of his shopping bag, his person and his boots and to the dog sniff of his boots.  As set forth above, consensual encounters do not implicate the Fourth Amendment.  Accordingly, there can be no Fourth Amendment violations arising from the encounter between Defendant and Agent Perry at the bus station.

**B.** **Detention of Defendant and Transport to the DEA Office**

After Taz failed to alert to Defendant's boots, Agent Perry informed Defendant that he was being detaining pending execution of a warrant to search the soles of the boots.  Further, Agent Perry told Defendant that, while he was not under arrest, he was not free to leave and would be taken to the DEA Office.  Defendant was handcuffed and transported in TFO Rees's vehicle to the DEA Office, where he was placed in a holding cell.

Defendant argues that, at this point, his seizure escalated into an arrest.  Defendant further argues that Agent Perry did not have probable cause that Defendant was transporting drugs.  Because the Fourth Amendment requires probable cause for an arrest, Defendant concludes that his arrest violated the Fourth Amendment.

In its response, the government does not address this argument.  Rather, the government's response contains a section arguing that Agent Perry had reasonable suspicion to detain Defendant and another section arguing that Agent Perry had probable cause to arrest Defendant, based in part on the discovery of the bundles inside of the soles of Defendant's boots.  As the bundles inside of the soles of Defendant's boots were not discovered until the search warrant was executed, the government's position must be that Defendant was not arrested until after execution of the search warrant when he was read his *Miranda* rights.  Thus, it appears that the government believes that Defendant's seizure up to the point where he was read his *Miranda* rights was an investigative detention that could be justified by reasonable suspicion alone.  This position is clearly contrary to the relevant case law.

It is well-settled that "[t]ransportation of a defendant to the police station can not be justified absent probable cause to believe the defendant committed a crime."  *Shareef*, 100 F.3d at 1508.  The

-12-

Supreme Court has made clear that the line between brief detention and full-fledged arrest "is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Hayes v. Florida*, 470 U.S. 811, 816 (1985). Such seizures, the Supreme Court held, "are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Id.*

In *Hayes*, police officers convinced a person to accompany them voluntarily to the police station to provide fingerprints. Although the officers lacked either a warrant or probable cause, one of them indicated that they would arrest Hayes if he refused to come with them. Hayes chose not to call their bluff. The officers placed him under arrest at the station once they concluded that his fingerprints matched those of their suspect. The Supreme Court reversed Hayes' conviction based on the fingerprint evidence, concluding that the officers' seizure of Hayes was sufficiently like an arrest to require probable cause, which had not been met.

Applying *Hayes*, in *United States v. Gonzales*, 763 F.2d 1127 (10th Cir. 1985), the Tenth Circuit found that although a police officer had not used physical force to remove the defendant from the highway, he nonetheless coerced the defendant using means no less forcible than the threat to arrest in *Hayes*, namely, "the officer had defendant's driver's license, car registration, and title at the time he 'asked' defendant to follow him to the station." *Id.* at 1132. The Tenth Circuit agreed with the district court that the defendant "had no reasonable choice other than to accompany the officer no matter how polite the officer was in phrasing his request." *Id.* The Tenth Circuit interpreted *Hayes* "as eliminating the option of forcing the suspect to go to the police station from the alternatives available to the officer during an investigative detention." *Id.* at 1133.

-13-

In the instant case, Agent Perry told Defendant that he was being detained and was not free to leave, and TFO Rees transported him in his police vehicle to the DEA Office, where he was held for several hours.  Defendant was also placed in handcuffs.  Under *Hayes*, at this point in the encounter, Agent Perry crossed the line between brief detention and full-fledged arrest.  Accordingly, Defendant's seizure became sufficiently like an arrest to invoke the traditional rule that arrests constitutionally may be made only on probable cause.

The instant case is distinguishable from *United States v. Glover*, 957 F.2d 1004 (2d Cir. 1992), which the government cites in support of its argument that Agent Perry had reasonable suspicion to detain Defendant.  In *Glover*, officers were waiting at the bus terminal in Buffalo for a bus arriving from New York City, which bus the officers knew was used by drug traffickers to transport narcotics to the Buffalo area.  Because the defendant separated himself from the other passengers, entering the terminal through a different gate from the others, the officers noticed him. The officers then observed that the defendant appeared nervous, continually looked over his shoulder and was the only person sweating on a cool day.  The defendant entered the terminal carrying a shoulder bag and a small suitcase, walking very slowly toward the exit and scanning the terminal in a jerky fashion.  One of the officers approached the defendant, identified himself as a police officer and asked if he could question the defendant.  The defendant agreed.  The officer asked the defendant for identification.  The defendant gave the officer a handwritten employee identification card and a photocopied social security document with an illegible number, each of which had a different address. The defendant informed the officers that he was in town to pay a surprise visit to his aunt.  The officer asked if he could call his aunt to confirm his identification.  The defendant refused, saying that a phone call would ruin the surprise.  The defendant also refused to allow the officer to call his

-14-

employer, stating that his employer wrongly believed that he had taken a sick day.  Throughout the

encounter, the defendant was sweating, shaking and looking toward the exit.  The officer asked the

defendant if he was carrying narcotics and the defendant said no.  The defendant then refused the

officer's request to search his bags, stating that he did not have probable cause.  While still holding

the defendant's identification, the officer asked if the defendant would accompany him to the NFTA

security office thirty feet away from the terminal exit for a further check on his identification.  The

defendant agreed to go.  Once in the office, the defendant again refused a request to have his bags

searched.  The officer informed the defendant that his bags would be detained until a dog arrived to

do a sniff test.  The officer told the defendant that, although his bags would be detained, he was free

to leave.  The officer also told the defendant that if the dog alerted to the bags, the officers would

apply for a search warrant.  The defendant refused to leave, insisting that he wanted to remain to

make sure the officers obtained a warrant.  Thirty minutes later, the dog arrived and alerted to the

bags.  Once informed of the alert, the defendant told the officers to search his bags, which contained

drugs.

   The Second Circuit found that, prior to the time the officer asked the defendant to go to the

NFTA security office, the encounter was consensual.  The Second Circuit further found that, when

the officer asked the defendant "to leave the public area of the terminal and to return to the NFTA

security office for further questioning, without returning Glover's identification and without telling

Glover that he was free to leave," the defendant and his bags were seized.  *Id.* at 1009.  The Second

Circuit reached this finding because a reasonable person in the defendant's position would not have

felt free to leave at that point.  The Second Circuit then determined that the defendant's overall

conduct (as set forth above), viewed objectively by an officer familiar with drug courier practices,

gave rise to a reasonable suspicion that the defendant was transporting narcotics, thereby warranting the detention of the defendant and his bags for further investigation.  Next, the Second Circuit determined that the officers' actual conduct fell within the permissible scope of an investigative detention.  In reaching this determination, the Second Circuit distinguished the case before it from the Supreme Court decision in *Florida v. Royer*, 460 U.S. 491 (1983).  In *Royer*, the Supreme Court found that the defendant was subject to a *de facto* arrest where the officers had approached the defendant in an airport, questioned him, obtained his airline tickets and identification, told him he was suspected of drug trafficking, and asked him to accompany them to a police room where they proceeded with their investigation and retrieved his luggage without his consent, all without ever telling him that he was free to leave and catch his plane.  Unlike the defendant in *Royer*, the defendant in *Glover* "was expressly told that he was free to leave the office."  *Glover*, 957 F.2d at 1012.  Thus, the Second Circuit concluded that "once Glover was told he was free to leave, he was, under the circumstances of this case, plainly not under arrest."  *Id.*  In addition, the Second Circuit noted that only thirty minutes had elapsed from the time the defendant and his bag were seized and the arrival of the dog.  The Second Circuit concluded that a thirty-minute detention "to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion on Glover's Fourth Amendment interests wholly justified by reasonable suspicion."  *Id.* at 1013.

Based on the fact alone that Defendant herein was specifically told that he was being detained and was not free to leave, this case is distinguishable from *Glover* and similar to *Royer*.  Moreover, the detention in the instant case appears to have lasted several hours as opposed to the thirty-minute detention at issue in *Glover*.  Further, while the detention in *Glover* was to conduct brief questioning and await the arrival of a dog, the detention in this case was for a different purpose, namely, to obtain

a search warrant, and actually took place *after* the officer had exhausted his questions and had conducted two dog sniffs with less than positive results.  Thus, even assuming that the totality of the circumstances created a reasonable suspicion that Defendant was carrying drugs, the officers' actual conduct did not fall within the permissible scope of an investigative detention.

The Court thus must determine whether Agent Perry and TFO Rees had probable cause to remove Defendant from the bus station, transport him to the DEA Office and continue to detain him while obtaining the warrant to search the soles of his boots. In the case of a seizure, probable cause exists "when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir.) (citation omitted), *cert. denied*, 525 U.S. 978 (1998).  In determining whether there is probable cause, the Court must "look at the totality of the circumstances of each particular case." *Id.* Probable cause "does not require facts sufficient to establish guilt, but does require more than mere suspicion." *Id.*

The Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs." *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (citing *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir.), *cert. denied*, 513 U.S. 1059 (1994); *United States v. Sukiz-Grado*, 22 F.3d 1006, 1009 (10th Cir. 1994); *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1994)).  In *Ludwig*, the Tenth Circuit held that "a dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband." *Ludwig*, 10 F.3d at 1527.  In the instant case, however, during the two dog sniffs conducted before Defendant was transported to the DEA Office, the dog did not alert to

-17-

Defendant's boots.  Rather, Taz did something less than a full alert, which TFO Rees described as

an "odor change."   Based on his experience working with Taz, TFO Rees interpreted the "odor

change" behavior exhibited by Taz to mean that Taz smelled the odor of narcotics and was in the

process of trying to find the source of the odor.  TFO Rees also identified certain wind and space

conditions that he believed made it difficult for Taz to locate the source of the odor of narcotics that

he smelled.  Thus, TFO Rees's testimony established that, during the two sniffs conducted before

Defendant's arrest, although Taz did not alert to the source of the odor of narcotics, he exhibited an

"odor change" which indicated that he smelled the odor of narcotics.

Courts to have considered the issue have found that a dog's interest in an item subject to a

dog sniff, short of a full alert, alone does not constitute probable cause.[1]  *See United States v.*

*Guzman*, 75 F.3d 1090, 1096 (6th Cir.), *cert. denied*, 519 U.S. 906 (1996); *United States v. Jacobs*,

986 F.2d 1231, 1235 (8th Cir. 1993).   For example, in *Jacobs*, officers submitted a warrant

application that correctly informed the magistrate judge that, during a dog sniff, the dog had shown

an interest in the defendant's package, but neglected to include the fact that the dog had not given

a full alert to the package and that the dog handler admitted that he could not say with certainty that

drugs were in the package.  The Eighth Circuit held that, if the warrant application had included the

omitted information, it would not support probable cause.  The Eighth Circuit explained that the

evidence in support of probable cause would be limited to a tip that the officer received from an

officer in another state that a federal express package addressed to the defendant appeared to be

suspicious, plus the fact that the dog had shown an interest in the package but had not alerted to it.

The Eighth Circuit held that while this evidence "might have provided reasonable suspicion that [the

---

[1]  The Court has found no cases in the Tenth Circuit addressing this issue.

package] contained contraband . . . the police clearly lacked the probable cause necessary to open the package." *Jacobs*, 985 F.2d at 1235.

Nonetheless, courts also uniformly have held that a dog's interest, even if less than a full alert, is a factor to be considered in determining whether the totality of the circumstances establishes probable cause. *See Guzman*, 75 F.3d at 1096; *United States v. Stephens*, 129 F.3d 1266, 1997 WL 720412, **4 (6th Cir. Nov. 14, 1997) (unpublished disposition); *United States v. Jacobs*, 125 Fed. Appx. 518, 522 (5th Cir. 2005). For example, in *Guzman*, the defendant gave officers permission to have a dog sniff his bag as he exited a bus. The dog was trained to become excited and then to sit when she detected the presence of drugs. One officer testified that her dog "showed interest" in the defendant's bag, "sniffing real hard trying to put her face down in the bag more," but did not sit down. *Guzman*, 75 F.3d at 1092. That officer advised another officer on the scene that her dog had shown an interest in the defendant's bag. Subsequently, the other officer put his hand on the defendant's bag and felt several hard bricks inside, which he immediately thought were drugs. That officer removed the defendant and his bag from the bus. On the defendant's motion to suppress the evidence obtained as a result of the seizure of his person and his bag, the district court found that the officer had probable cause based on two factors: the interest of the dog in the defendant's bag and the officer's touch of the bag and his recognition of bricks in the bag as bundles of drugs. On appeal, the defendant argued that the totality of the circumstances was insufficient to create probable cause. The Sixth Circuit disagreed. First, the Sixth Circuit found no reason to disregard the district court's determination that one of the officers immediately recognized the bricks in the defendant's bag to be drugs when he touched the bag. Next, the Sixth Circuit found that, although "the dog's 'interest' in the bag alone would not constitute probable cause," this fact did not "preclude[] [the Court] from

-19-

considering Officer Hoing's awareness of the dog's interest in defendant Guzman's bag when determining whether the totality of the circumstances established probable cause to seize defendant Guzman." *Id.* at 1096.  In light of the totality of the circumstances, *i.e.*, the dog's interest in the bag and the officer's recognition of the bricks in the defendant's bag as drugs, the Sixth Circuit concluded "that the district court's finding that the officer had probable cause to seize defendant and his bag was not clearly erroneous." *Id.*

Similarly, in *Stephens*, a dog sniff was conducted by two dogs on the defendant's bag. Neither dog alerted to the bag, but one dog showed some interest in it.  When the officer told the defendant that the dogs had not alerted, the defendant asked whether "it was possible to fool the dogs," which the officer thought was an unusual question. *Stephens*, 1997 WL 720412 at **3.  After the dogs failed to alert, the officers told the defendant that she was free to leave but that they were detaining her bag in order to obtain a search warrant.  In appealing the denial of her motion to suppress, the defendant argued that the officers unlawfully seized her bag after the dogs failed to give a positive alert.  In rejecting this argument, the Sixth Circuit first cited to *Guzman* for the proposition that "a dog's mere interest in a bag, short of a positive alert, does not constitute probable cause." *Id*. at **4.  In the case before it, however, the Sixth Circuit noted that "in addition to knowing of the dog's interest in the bag during the initial dog sniff, the officers also had several other pieces of relevant information." *Id.*  Specifically, the defendant matched several characteristics of the drug courier profile, she lied to the officers about having checked luggage and did not disclose her baggage check, her luggage felt similar to other luggage that the officers had seized and that had been found to contain drugs, her luggage contained no personal identification and the defendant made the unusual remark about fooling drug sniffing dogs.  Given all of the information in the officers' possession,

including the dog's interest in the bag, the Sixth Circuit concluded that, "based on the totality of the circumstances, the officers had probable cause to believe that defendant's luggage contained contraband at the time it was seized and detained while the officers sought a search warrant." *Id.*

Finally, in *Jacobs*, during the course of a routine drug interdiction at a federal express store, a detective noticed a package that looked suspicious. Specifically, the package was taped with clear packaging tape, it was shipped priority overnight from Sandra Peterson in California to Miss Peterson in Louisiana, the sender paid cash to ship the parcel, no telephone numbers were listed for either the sender or the recipient, and the package had a strong odor of dryer sheets and of a chemical solvent consistent with the scent of the narcotic phencyclidine (PCP). The detective placed the suspicious package among other packages and brought his drug-sniffing dog into the facility. His dog was trained to give a "hard alert" when he detected narcotics, which involved sitting down in front of the package containing narcotics. When the dog came to the suspicious package, he gave a "passive alert," walking by the box, pausing, looking at the package, looking at the detective and looking again at the package. Based on the dog's reaction, the detective seized the package and sought a search warrant to open it. In his warrant application, the detective noted the suspicious characteristics of the package and also stated that the dog "gave a positive 'alert' on this parcel indicating the parcel had been saturated with the scent of illegal narcotics." *Jacobs*, 125 Fed. Appx. at 519. A warrant was issued. The defendant filed a motion to suppress, arguing that the warrant was defective because the detective misled the court regarding the dog's response to the package. The district court found that, even if the affidavit had explicitly noted that the dog did not give its trained response, the passive response coupled with the other characteristics of the package created probable cause. The Fifth Circuit affirmed, agreeing that "the remaining information [in the application], coupled with a more

complete description of Taz's alert, provided probable cause for the warrant." *Id.* at 522. The Fifth

Circuit rejected the defendant's argument that "any one of the characteristics of the package taken

on its own would not create a high enough probability of criminal activity to justify a search." *Id.*

The Court explained:

> [L]ooking at each characteristic of the package in isolation is irrelevant because
> probable cause is evaluated under a totality of the circumstances test. The package
> drew [the detective's] attention based on the combination of several factors. Based
> on his police experience, even before Taz identified the package, he was reasonably
> certain that the package contained narcotics. This, coupled with Taz's clear
> expression of interest in the package, made it highly probable that there was criminal
> activity afoot and that probable cause existed.

*Id.*

Accordingly, the Court herein must look at the totality of the circumstances, including the

"odor changes" exhibited by Taz during both dog sniffs, in order to determine whether Agent Perry

had probable cause to detain Defendant while obtaining a search warrant. The credible evidence

shows the following facts and circumstances. Defendant was traveling on a bus from El Paso, Texas,

which Agent Perry knew to be a source city for illegal narcotics. Defendant was visiting his parents

in Albuquerque for a week but had no luggage other than a shopping bag, which contained only a pair

of boots, a pair of house shoes and a sweatshirt. In previous seizures Agent Perry made of individuals

with narcotics in their footwear, the individuals similarly were traveling with virtually no luggage

other than a change of shoes. Agent Perry observed that Defendant's boots looked ballooned up, as

if they were too small or had something underneath pushing up on the top of the boots. In addition,

Agent Perry noticed that the boots had alligator-type, thin-skinned scales. Agent Perry previously

had found approximately twenty pairs of boots that had been abandoned in a yard in Los Lunas with

the same alligator-type, thin-skinned scales. Those boots all had the heel or sole removed, revealing

false compartments.  In his seven years of experience as a DEA agent, Agent Perry made eight seizures of individuals who were traveling by bus from El Paso to Albuquerque with heroin concealed in their boots, shoes or sneakers.  Once Defendant had removed his boots and handed them to Agent Perry, Agent Perry observed what he described as a "distinct bulge" on the bottom of the boots, in addition to a black dressing covering the entire bottom of the boot.  The tags on the boots showed that the boots were size ten "Star" brand boots.  The abandoned boots that Agent Perry had found in the yard in Los Lunas also were black, size ten "Star" brand boots.  Agent Perry observed that the boots seemed overly heavy, especially in comparison to the tan boots in Defendant's bag.  Agent Perry also saw glue in the inner sole area of the boots and smelled an odor of fresh glue.  In the previous seizures that Agent Perry made involving heroin concealed in footwear, the footwear similarly felt overly heavy and smelled of fresh glue.  Although the boots smelled of fresh glue and the bottom of the boots had a fresh, black dressing with no signs of wear, Defendant told Agent Perry that he had purchased the boots one month earlier.  In response to Agent Perry's question as to why his boots were so heavy, Defendant gave the unusual answer that he intentionally purchased heavy boots so that he would get exercise when he walked.  During the two dog sniffs that TFO Rees conducted on Defendant's boots, although Taz did not actually alert and thus did not identify the source of the odor of narcotics, Taz did exhibit an "odor change," which TFO Rees, based on his experience with Taz, interpreted to mean that Taz smelled the odor of narcotics and was trying to locate the source of that odor.  TFO Rees noted that certain conditions, including the wind and the fact that the boots were placed close together, could have accounted for Taz's failure to identify the source of the odor of narcotics that he smelled.  Taken together, these facts and circumstances created more than a mere suspicion of criminal activity and would have led a reasonable person to

believe that Defendant was carrying illegal drugs in his boots.  Accordingly, Agent Perry had sufficient probable cause to transport Defendant to the DEA Office while obtaining a search warrant. Because the Court finds that Defendant's detention was based on probable cause, there was no Fourth Amendment violation arising from this detention.

### C.       Detention of Defendant's Boots

After the second dog sniff at the bus station, Agent Perry informed Defendant that his black boots were being detained while he sought a warrant to search the soles of the boots for illegal narcotics.  Defendant argues that, once the dog failed to alert to the boots, Agent Perry had neither reasonable suspicion nor probable cause to believe that the boots contained narcotics.  Accordingly, Defendant concludes, the detention of his boots violates the Fourth Amendment.  In its response, the government argues that Agent Perry had reasonable suspicion to detain the boots but does not address whether there was probable cause to detain the boots.  Accordingly, it appears that the government's position is that reasonable suspicion was all that was necessary to detain the boots.

The general rule is that a seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."  *United States v. Place*, 462 U.S. 696, 701 (1983).  If, however, officers want to seize an item in order to secure a search warrant for it, they may do so based on probable cause plus exigent circumstances.  As the Supreme Court explained in *Place*:

> Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.

*Id.* at 701.  In *Place*, the Supreme Court established that, in the absence of a search warrant or probable cause and exigent circumstances, if law enforcement authorities have reasonable suspicion that a piece of luggage contains narcotics, they may "detain the luggage briefly to investigate the circumstances that aroused [the] suspicion, provided that the investigative detention is properly limited in scope."  *Id.* at 706.

In the instant case, Agent Perry did not have a search warrant to detain Defendant's boots but rather detained the boots while obtaining a search warrant.  Accordingly, this detention comports with the Fourth Amendment only if either: (1) it fits within the definition set forth in *Place* of a brief investigation based on reasonable suspicion; or (2) it was done based on probable cause and exigent circumstances.

In *Place*, the Supreme Court considered the reasonableness of the seizure of property for the purpose of conducting a dog sniff.  Specifically, in *Place*, agents detained the defendant's personal luggage at the airport for ninety minutes for the purpose of exposing it to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contained narcotics.  *See id.* at 697-98.  Although concluding that the dog sniff was not a search, the Supreme Court held that there was "no doubt that the agents made a 'seizure' of [the defendant]'s luggage for purposes of the Fourth Amendment" when they took the luggage from his custody in order to arrange exposure to a narcotics detection dog.  *Id.* at 707.  The Supreme Court set forth two factors relevant to determine whether the agents' conduct exceeded the permissible scope of an investigative detention: first, "the brevity of the invasion of the individual's Fourth Amendment interests"; and second, the diligence of the officers in pursuing their investigation.  *See id.* at 709.  Applying this standard to the facts before it, the Supreme Court found that the agents had exceeded the permissible limits of an investigative

stop.  First, the Supreme Court held that the length of time alone -- ninety minutes -- precluded a determination that the seizure was reasonable without probable cause.  *See id.*  Moreover, the Supreme Court found that the intrusion "was exacerbated by the failure of the agents to accurately inform the respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion."  *Id.* at 710.  As a result, the Supreme Court held that the seizure of the defendant's luggage was unreasonable under the Fourth Amendment and that, accordingly, the evidence obtained from the subsequent dog sniff was inadmissible.  *See id.*

In *United States v. Scales*, 903 F.2d 765 (10th Cir. 1990), the Tenth Circuit applied *Place* to determine whether the seizure of the defendant's luggage was reasonable.  Agents boarded a train in Albuquerque and noticed the defendant, who was shaking and looking around the train car.  The agents requested and received the defendant's consent to search his small duffel bag.  The agents found nothing in the bag and asked the defendant about a larger suitcase on the rack above him.  The defendant opened the suitcase, which contained two shoe-box sized packages and one larger package covered by plain brown wrapping paper and sealed with brown tape.  The defendant refused to allow the agents to open the boxes.  The agents felt they lacked probable cause to search the luggage or arrest the defendant so they left the train.  The agents then checked the defendant's criminal history and found that he had been arrested for possession of a controlled substance.  The agents then reboarded the train at its next stop, Las Vegas, New Mexico, and told the defendant that they were taking his luggage and handed him a receipt.  The agents were unable to leave the train, however, because it had started moving.  During a subsequent conversation with a train employee, the agents learned that some problems with the plumbing on the train had developed shortly after the train left

-26-

Albuquerque, and that some employees had found in a bathroom trash can two empty shoe boxes, newspaper, coffee grounds and brown wrapping paper with tape.  The agents left the train with the defendant's suitcase and the empty boxes at the next stop, Raton.  They did not arrest the defendant because they did not know what was in the suitcase.  From Raton, the agents drove to Santa Fe, where they put the suitcase before a two-dog drug sniffing team.  The dogs separately alerted to the suitcase for narcotics.  The dog alert occurred seven hours after the agents seized the suitcase.  The agents then drove to Albuquerque and obtained a search warrant for the packages inside the suitcase. Upon execution of the warrant, the agents discovered cocaine.

The Tenth Circuit held that the seven hour delay in the case before it went beyond the brevity required for a *Place* seizure.  Moreover, the Tenth Circuit noted that, in examining whether the agents could have minimized the intrusion on the defendant's Fourth Amendment interests, "unexplored alternatives to the course of action did exist."  *Id.* at 769.  For example, the Tenth Circuit stated, the agents did not telephone the dogs' handler to inquire whether the dogs could be brought to the train station.  In addition, the Tenth Circuit found that, as in *Place*, the intrusion was exacerbated by the failure of the agents to accurately inform the defendant of the place to which they were transporting the luggage, the length of time he might be dispossessed and of the arrangements that would be made to return the luggage.  All the agents did was to give the defendant a receipt. Accordingly, the Tenth Circuit concluded that, under *Place*, the seizure of the defendant's suitcase exceeded the agents' narrow authority to detain the suitcase briefly for investigative purposes.

In *United States v. Respress*, 9 F.3d 483 (6th Cir. 1993), the Sixth Circuit considered whether officers had sufficient justification to seize a suitcase while obtaining a search warrant.  Based on their observation of the defendant at an airport, officers suspected that the defendant was carrying drugs.

-27-

The officers approached the defendant, who was connecting from one flight to another and, after asking him a series of questions, asked him if he would consent to a search of his person and his baggage, which had been checked.  The defendant refused.  The officer told the defendant that he was not under arrest and was free to go.  The defendant then continued on his way to his connecting flight, and the officer went to the airport police office intending to call for a dog sniff test of the defendant's baggage.  The defendant, however, left the terminal and got into a taxi (without his luggage which was on its way to the defendant's scheduled final destination).  The agent then stopped the taxi and questioned the defendant.  The agent again asked for consent to search the defendant's suitcase and the defendant again refused.  The agent then told the defendant that he would attempt to seize his bag and get a search warrant for it, and the defendant departed.  During the next several hours, the agent retrieved the defendant's suitcase from the airline, completed an affidavit, and presented the affidavit to a magistrate judge.  Approximately ten hours later, the search warrant was signed and a search was conducted pursuant to which the agents discovered cocaine.

The Sixth Circuit first rejected the government's argument that *Place* was controlling, explaining, "[t]his is not a case involving reasonable suspicion which justifies something less than a search (e.g., a sniff test), nor is this a case in which a positive sniff test takes 'reasonable suspicion' into the realm of 'probable cause' thus justifying the issuance of a search warrant."  *Id.* at 486. Rather, the Sixth Circuit stated, "[t]his was a plain old-fashioned seizure of a person's effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted."  *Id.*  Accordingly, the Sixth Circuit explained that, in order to determine whether the detention of the defendant's suitcase comported with the Fourth Amendment, it needed only to consider whether the officer had probable cause.  The Sixth Circuit found that the

officer did have probable cause based on the following facts:  the defendant had certain characteristics that matched those of the typical drug courier, including coming from a drug source city and having purchased a one-way ticket with cash immediately before his departure; the name on his ticket was not his real name; his driver's licence address was different from his claimed place of residence; he suddenly changed his travel plans after talking to the officer; he gave conflicting travel plans to the taxi driver and to the officer; he told the officer he was visiting a friend in Cincinnati, but had no address for the friend; while in the taxi, his plane ticket "fell" out of his pocket so far down in between the seat cushions that removal of the seat was necessary in order to retrieve it; and by purposely missing his connecting flight to Akron and getting in a taxi to go somewhere in Cincinnati, he abandoned his luggage with the apparent purpose of distancing himself from what might be found in his suitcase.  In addition, the Sixth Circuit found that the duration of the seizure pending the issuance of the search warrant, which was approximately ten hours, was reasonable.

Under this precedent, the Court first must determine whether the detention of Defendant's boots fits within the definition set forth in *Place* of a brief investigation based on reasonable suspicion. Although TFO Rees conducted a second dog sniff after the boots were detained, the purpose for detaining the boots was to obtain a search warrant to cut into the soles of the boots, not to conduct a dog sniff.  As set forth in *Place*, the detention must be for the purpose of "investigat[ing] the circumstances that aroused [the] suspicion."  *Place*, 462 U.S. at 706.  As discussed in *Respress*, *Place* allows "something less than a search (e.g., a sniff test)."  *Respress*, 9 F.3d at 486.  The Court finds that obtaining a search warrant is not akin to a sniff test and is not otherwise something less than a search that would fit within the scope of an investigation of the circumstances that aroused Agent Perry's suspicion. *See Stephens*, 1997 WL 720412 at **4 n.3 (holding that the district court should

-29-

have applied a probable cause analysis rather than a reasonable suspicion analysis when, although a third dog sniff was conducted at the police station, the purpose of the removal of the defendant's bag to the police station was to detain it while the officers got a search warrant, not to conduct further investigation).

The Supreme Court in *Place* also required that the detention be brief and found that a ninety minute detention of luggage, where the defendant was not informed where the luggage was being transported, how long he might be without his luggage and what arrangements would be made for the return of his luggage, was unreasonable.  In *Scales*, the Sixth Circuit found that a seven-hour detention of luggage in order to subject it to a dog sniff was too long to qualify as a brief detention for investigative purposes.   In the instant case, the detention of Defendant's boots lasted approximately five hours.  Moreover, there is no evidence that Agent Perry informed Defendant where his boots were or how long he might be without them, or that Agent Perry explored any alternatives to the course of action that he took.  Accordingly, the Court finds that the five-hour detention of Defendant's boots exceeded Agent Perry's narrow authority to detain the boots briefly for investigative purposes.

Because the Court determines that the detention of Defendant's boots does not fall within the definition set forth in *Place* of a brief investigative detention, the Court next must determine whether "[t]his was a plain old-fashioned seizure of a person's effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted."  *Respress*, 9 F.3d at 486.  As set forth above, the Court must consider the totality of the circumstances, including the "odor changes" exhibited by Taz during both dog sniffs, in order to determine whether Agent Perry had probable cause to detain Defendant's boots while obtaining a

search warrant.  Also as set forth above, the credible evidence shows that the facts and circumstances created more than a mere suspicion of criminal activity and would have led a reasonable person to believe that there were illegal drugs in Defendant's boots.  Accordingly, Agent Perry had sufficient probable cause to transport Defendant's boots to the DEA Office in order to prevent the disappearance of evidence and so that a warrant could be obtained.  Because the Court finds that the detention of the boots was based on probable cause and exigent circumstances, there was no Fourth Amendment violation arising from this detention.

<u>CONCLUSION</u>

The entire encounter between Agent Perry and Defendant at the bus station was consensual and, during the course of this consensual encounter, Defendant provided valid consent to the search of his shopping bag, his person and his boots and to the dog sniff of his boots.  Because consensual encounters do not implicate the Fourth Amendment, there can be no Fourth Amendment violations arising from the encounter between Defendant and Agent Perry at the bus station.  The credible evidence shows that the totality of the circumstances created more than a mere suspicion of criminal activity and would have led a reasonable person to believe that Defendant was carrying illegal drugs in his boots.  Accordingly, Agent Perry had sufficient probable cause to transport Defendant and his boots to the DEA Office while obtaining a search warrant.  Because the detention of Defendant and his boots was based on probable cause, there was no Fourth Amendment violation arising from this detention.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress **[Doc. No. 18]** is hereby **DENIED**.

Dated this 27th day of October, 2005.


MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


Attorney for Plaintiff:
Elaine Ramirez

Attorney for Defendant:
Margaret Katze